# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-1067V

|  |  |
|---|---|
| ALICIA SAWYER, as Parent and Natural Guardian of G.S., a Minor,<br><br>              Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>              Respondent. | Chief Special Master Corcoran<br><br>Filed: April 15, 2026 |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Adam Nemeth Muffett, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On July 12, 2023, Alicia Sawyer, as parent and natural guardian of G.S., a minor, filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that G.S. suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a human papillomavirus ("HPV") vaccine G.S. received on July 13, 2022. Petition at 1. The

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

I previously provided the parties with my preliminary views on the contested matters (ECF No. 23). However, the parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 26, 27, 30). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $42,500.00, plus $463.04 for out-of-pocket expenses.

## I. Factual Evidence

### A. Medical Records

G.S., then twelve years old, received an HPV vaccine in his left arm on July 13, 2022. Ex. 4 at 18. The vaccine was administered during a routine annual appointment. Twelve days later (July 25, 2022), G.S. returned to his pediatrician complaining of left shoulder pain off and on in the "arm where [G.S] received HPV vaccine." *Id*. at 13. He had been using his arm more than usual while on vacation the week before, and had not had severe pain during that time. *Id*. The examination findings refer to G.S.'s *right* shoulder instead of left – but because the record otherwise refers only to his left shoulder, this is likely a typo.

On examination, G.S.'s shoulder exhibited full range of motion ("ROM"), with discomfort in external rotation. Ex. 4 at 14. The pediatrician suspected mild inflammation within the shoulder joint based on G.S.'s symptoms and ROM testing, noting that there was "no restriction of movement noted." *Id*. G.S. was advised to take over-the-counter medication and rest. *Id*.

On the same day (July 25, 2022), G.S. saw a pediatric orthopedist for left shoulder pain. Ex. 7 at 19. G.S. had received a vaccine two weeks prior and had "significant pain immediately following the vaccination." *Id*. His shoulder had continued to bother him, occasionally waking him at night. *Id*. On examination, G.S. was noted to exhibit "full and symmetric range of motion of his left shoulder when compared to the right." *Id*. The orthopedist thought G.S.'s condition would resolve on its own, possibly with physical therapy ("PT"), and recommended over-the-counter medication. *Id*.

On July 26, 2022, G.S.'s pediatrician submitted information about G.S.'s injury to the Vaccine Adverse Event Reporting System ("VAERS"). Ex. 11 at 3-4. In the report, G.S.'s pediatrician listed the date and time the adverse reaction started as 9:00 P.M. on the date of vaccination – ten hours after vaccination. *Id*. at 3. The VAERS report correctly notes that G.S. received the vaccine in his left arm. *Id*. at 4. However, in describing G.S.'s injury, he referred to G.S.'s *right* shoulder – again a likely typo. *Id*. He explained that G.S.

suffered "[p]ain at injection site and eventually within the next 24 hrs also present in" shoulder joint. *Id*. And G.S. had experienced shoulder pain off and on since vaccination. *Id*. The pediatrician had seen G.S. the day before filing the VAERS report, and noted that G.S. seemingly had "full use/no limitations of arm." *Id*.

G.S. underwent a left shoulder MRI on July 28, 2022. Ex. 12 at 14-15. The MRI showed subacromial/subdeltoid bursal effusion/bursitis, mild reactive adenopathy, and an intact rotator cuff. *Id*.

G.S. returned to the orthopedist on August 3, 2022 to review the MRI. Ex. 7 at 21. He reported minimal improvement, and stated he was primarily bothered during football, when doing burpees, pushups, or blocking drills. *Id*. The orthopedist noted that G.S. had full ROM of both shoulders, with some mild tenderness of the left shoulder. The orthopedist assessed him with bursitis and ordered PT. *Id*. He added that they would "make some mild adjustments in football so he can continue to play." *Id*.

G.S. underwent a PT evaluation of his left shoulder on August 10, 2022. Ex. 8 at 19. The PT record lists an injury onset date of July 13, 2022, explaining that G.S. sought care for shoulder pain following vaccination on that date. *Id*. Petitioner (G.S.'s mother) stated that the needle was placed high in G.S.'s shoulder, and he was "hysterical" after vaccination, describing pain that felt like a "knife stabbing his shoulder." *Id*. G.S. rated his pain three out of ten at best, and six out of ten at worst. *Id*.

On examination, G.S. had symmetrical ROM in both shoulders in flexion and abduction. Ex. 8 at 20. However, his passive shoulder ROM in external rotation was 85 degrees on the left side and 90 degrees on the right side. Id. His passive ROM in internal rotation was 70 degrees on the left side and 75 degrees on the right side. *Id*. And there were also minor differences in G.S.'s active ROM in functional external rotation and internal rotation.[3] G.S. also exhibited reduced left shoulder strength compared to his right shoulder. *Id*. G.S. attended eight additional PT sessions over the next five months. Ex. 8 at 25-56.

G.S. returned to the orthopedist on September 7, 2022, reporting some improvement since his last visit. Ex. 7 at 23. He had returned to playing football, and was asymptomatic, though certain movements continued to cause pain. *Id*. The orthopedist recommended seven more PT sessions and consistent home exercises. *Id*.

G.S. attended his final PT session on January 16, 2023, just over six months after vaccination. Ex. 8 at 54. The record of this appointment states that G.S. was improving, but still experienced pain in some positions. *Id*. The therapist added more functional

---

[3] G.S.'s active ROM in functional external rotation reach was to his T5 vertebra on the left and to his T4 on the right. Ex. 8 at 20. And his active ROM in functional internal rotation reach was to his T6 vertebra on the left and to his T5 on the right. *Id.*

strengthening and form cues, and stated that G.S. would benefit from continued PT to address left shoulder pain, stability, neuro-motor control, endurance, and strength to his prior level of functioning. *Id*. at 55.

### B. Affidavits and Other Evidence

Petitioner submitted an affidavit in support of the claim. Ex. 9. Petitioner states that when G.S. received the at-issue vaccine, he "immediately became hysterical, crying in pain from the vaccine shot." *Id*. at ¶ 5. He had received regular injections for another condition for years, and had never reacted like he did on this occasion. *Id*. Petitioner's other child received a vaccine at the same visit, and had the same reaction. *Id*. Petitioner "immediately knew something was wrong from the excruciating pain the kids were in immediately" after vaccination. *Id*. at ¶ 6. Petitioner consulted with a nurse, who told her that the HPV vaccine "is just a painful vaccination." *Id*.

Petitioner gave G.S. over-the-counter medications for the next few weeks, but he continued to complain of shoulder pain that disrupted his sleep. Ex. 9 at ¶ 7. He went away to visit family for a week, and as soon as he returned home Petitioner took him to the pediatrician, then orthopedist. *Id*. at ¶¶ 8-10. Petitioner states that it took over six months of PT to help "calm" G.S.'s shoulder pain. *Id*. at ¶ 12.

G.S. submitted an affidavit. Ex. 14. In it, he states that he experienced difficulties after vaccination, especially with playing sports he enjoyed. *Id*. at ¶ 2. He attended all football practices and games in the fall of 2022 as required, but was unable to participate fully because of his shoulder pain. *Id*. He "barely played at all." *Id*. During football practice, he could not perform many drills due to shoulder pain, instead doing alternate drills that did not require use of his shoulder such as sit-ups and jogging. *Id*. at ¶ 3.

G.S. states that his shoulder injury prevented him from batting, pitching, throwing, and catching, and as a result he missed baseball tryouts that year. Ex. 14 at ¶ 4. Baseball is his favorite sport: he had played every other season since the age of five, and was "devastated" that he had to sit out an entire season. *Id*. G.S. also loves to ride minibikes, and was unable to do so for a time due to shoulder pain. *Id*. at ¶ 5.

Petitioner also filed printouts of text messages dated July 17, 2022. Ex. 13. The first set of messages appears to consist of messages between Petitioner and G.S., with G.S. stating that his arm where the vaccine was administered was "killing me" and "hurting really bad" and he did not know what to do. *Id*. at 1. Petitioner asked whether the pain had just started, and G.S. replied that it had "[b]een hurting." *Id*. When G.S. said the pain was keeping him awake, Petitioner instructed him to wake up his grandmother (with whom he was staying for a vacation) for Motrin. *Id*.

The second set of messages appears to be between Petitioner and G.S.'s grandmother. Ex. 13 at 2. Petitioner stated that G.S. texted her at 5am saying his arm

hurt and the pain interfered with his sleep. Petitioner's mother responded that she had given him medicine and he was okay. *Id*.

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

To obtain compensation under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support

6

SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B.  Parties' Arguments

Petitioner argues that G.S. continuously and consistently related the onset of his left shoulder pain to the relevant vaccination. Petitioner's Motion for Ruling on the Record, filed Jan. 2, 2025, at *7-8 (ECF No. 26) ("Mot."). Just four days after vaccination, G.S. sent text messages to his mother complaining of persistent pain at the injection site. Mot. at *8. Twelve days after vaccination, G.S. was seen by his pediatrician and an orthopedist complaining of pain resulting from vaccination. *Id*. Additionally, the VAERS report states that G.S. experienced pain within 24 hours of vaccination. And at his PT evaluation, G.S. reported pain at the time of vaccination, with no records suggesting that his pain resulted from anything other than vaccination. *Id*.

Petitioner further argues that G.S. experienced reduced ROM in his left shoulder. Mot. at *9. At his PT evaluation, G.S.'s left shoulder exhibited minor deficits in passive ROM in internal and external compared to his right shoulder. *Id*. One of his PT treatment goals was to improve his ROM. *Id*.

Concerning onset, Respondent argues that the text message where G.S. stated that his arm had "[b]een hurting" does not provide any evidence as to when the pain

7

started, merely implying that it had not *just* started. Respondent's Response, filed Mar. 3, 2025, at *2 (ECF No. 27) ("Resp."). Respondent suggests that this statement could "easily imply that the pain began earlier in the morning of July 17, 2022, still outside of the forty-eight hour period." Resp. at *2.

Respondent asserts that two physicians observed G.S. to have full ROM and no restrictions of movement in the weeks after vaccination. Resp. at *2. And Respondent argues that Petitioner has offered no evidence to clarify whether G.S.'s ROM was in fact limited, or if his therapist "was simply referring to pain at the outer ranges of movement, without an actual restriction in movement," which Respondent asserts would not satisfy the SIRVA QAI. *Id*. Respondent states that Petitioner has "offered no explanation as to why G.S.'s physical therapist would suddenly document reduced ROM, when G.S. had never complained of it before and his treating physicians had failed to observe it." *Id*. at *3. And Respondent suggests that G.S.'s return to football suggests the possibility of a subsequent unrelated injury. *Id*.

On reply, Petitioner notes that Respondent admits that G.S.'s medical records show reduced ROM, questioning instead why the physical therapist "would suddenly document reduced range of motion." Petitioner's Reply, filed Apr. 11, 2025, at *1 (ECF No. 30) ("Reply") (citing Resp. at *5).

### C. Factual Findings on Onset

I find that the record supports a finding that G.S.'s shoulder pain likely began within 48 hours of vaccination.

G.S. first saw a treater for shoulder pain just twelve days after vaccination. He related his pain to vaccination at that time, and consistently thereafter. This brief time period between vaccination and first treatment does not inherently call into question a connection between vaccination and the onset of G.S.'s pain – if anything, it is supportive of onset. It is common for SIRVA petitioners to delay seeking care for at least this long – if not *much longer* – because they expect the pain to go away on its own. *See Shiver v. Sec'y of Health & Human Servs*., No. 21-1961V, 2024 WL 4544185, at *11 (Fed. Cl. Spec. Mstr. Sept. 16, 2024) (finding evidence preponderantly established that onset of shoulder pain occurred within 48 hours of vaccination where the petitioner first sought care just two weeks after vaccination); *Amor v. Sec'y of Health & Human Servs*., No. 20-0978V, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) (noting that it is "common for petitioners in SIRVA cases to delay seeking care for weeks, or even months, in hopes that the pain will resolve without treatment" and finding onset was within 48 hours when Petitioner first sought care 23 days after vaccination).

Petitioner has also offered testimonial evidence and text messages that support a finding that G.S.'s pain began within 48 hours of vaccination. Additionally, G.S.'s pediatrician submitted a VAERS report stating that G.S. experienced pain on the day of

vaccination. Although Program case law has emphasized that VAERS reports are not particularly reliable evidence of causation, I have distinguished situations where a VAERS report is offered to resolve a factual question. *Lewis v. Sec'y of Health & Human Servs.*, No. 22-628V, 2025 WL 4657971, at *7 (Fed. Cl. Spec. Mstr. Aug. 28, 2025); *Kienow v. Sec'y of Health & Human Servs.*, No. 21-630V, 2024 WL 2852333, at *5 (Fed. Cl. Spec. Mstr. May 1, 2024).

### D. Factual Findings on Whether G.S. Exhibited Reduced ROM

The record also supports a finding that G.S. likely experienced reduced ROM. Although his treating physicians documented full ROM, his physical therapist later noted minor ROM deficits on examination. Although mild, this record contains evidence of ROM limitations. There is no requirement that limits in ROM persist throughout treatment, or that such limits manifest to a severe degree. The fact that the evidence supports only mild ROM deficits for a limited time is relevant to damages, but does not mean that this requirement is not satisfied.

### E. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that G.S. had a history of left shoulder pain or any other condition that would explain his post-vaccination symptoms. Ex. 4. His pain and ROM limitations were limited to the vaccinated shoulder. Ex. 4 at 13; Ex. 7 at 19; Ex. 8 at 19. G.S. received a covered vaccine in the United States. Ex. 4 at 18. G.S. experienced residual effects of his injury for more than six months. Ex. 8 at 54. And Petitioner states that she nor G.S. has ever received an award or settlement for G.S.'s vaccine-related injury, nor has a civil action been filed. Ex. 9 at ¶ 13.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Staub v. Sec'y of Health & Human Servs.*, No. 23-1611V, 2026 WL 800520 (Fed. Cl. Spec. Mstr. Mar. 4, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y*

*of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

### B. Parties' Damages Arguments

Petitioner requests a pain and suffering award of $42,500.00, citing *McGraw*, *Valdez*, and *Turnquest*, in which the claimants were awarded $37,500.00, $35,000.00, and $30,000.00, respectively, and *Sawyer*, in which Respondent proffered $42,500.00.[6] Mot. at *12-13. Petitioner asserts that the claimants in these matters had mild injuries of a similar duration to G.S., although they all sought care until two to three months after vaccination, and did not attend PT. *Id*. at *12-13. And *Sawyer*, 2024 WL 3549602, involves the same petitioner and G.S.'s sibling, who suffered a SIRVA from the same vaccine on the same date. *Id*.

Respondent proposes a pain and suffering award of $25,000.00. Resp. at *3-9. Respondent does not cite any additional decisions in support of his proposed award, and does not discuss *Sawyer*, 2024 WL 3549602, because it does not involve a reasoned damages decision. *Id*. at *4 n.1.

Respondent asserts that close examination of the facts shows that G.S.'s injury was *less* severe than the cited decisions. Resp. at *4. He contends that G.S. suffered mild pain, while the *McGraw* petitioner's pain was mostly reported as moderate. *Id*. at *5. And the *McGraw* petitioner received five Traumeel injections and acupuncture, as well as prescription medication. *Id*. Respondent asserts that the *Valdez* petitioner initially suffered severe pain, and declined PT for financial reasons. *Id*. at *6. Respondent adds that G.S.'s injury duration was significantly shorter than that of the *Turnquest* petitioner, and suggests that the injury in that case also may have been more severe in that surgery was recommended. *Id*. at *8. Respondent acknowledges that a $25,000.00 award would be an "outlier," but asks that I give significant weight to G.S.'s return to playing football, a physically demanding contact sport, in the weeks after vaccination. *Id*. at *9.

Petitioner replies that although he returned to football after vaccination, his participation was "at best, limited." Reply at *2. G.S. was a second-strong linebacker and

---

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[6] *McGraw v. Sec'y of Health & Human Servs.*, No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024); *Valdez v. Sec'y of Health & Human Servs.*, No.21-395V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024); *Turnquest v. Sec'y of Health & Human Servs.*, No. 21-65V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024); and *Sawyer v. Sec'y of Health & Human Servs.*, No. 23-825V, 2024 WL3549602 (Fed. Cl. Spec. Mstr. June 25, 2025).

largely remained on the bench. *Id*. He missed baseball tryouts, and could not ride minibikes with his dad. *Id*.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record does not reflect that G.S. suffered any impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of G.S.'s injury.

The record supports the conclusion that G.S. suffered a relatively mild SIRVA that persisted for about six months. He sought care soon after vaccination, which suggests a more painful injury. Although Respondent asserts that G.S. reported low pain levels, at his PT evaluation he rated his pain as ranging between three and six out of ten. Ex. 8 at 19. His ROM limitations were, however, clearly minimal, and he was able to obtain relief with conservative treatment (PT).

G.S.'s SIRVA affected his life in other ways. His participation in the 2022 football season was limited, and he was unable to participate in his baseball at all that year. The fact that he missed even *trying out* for baseball that year, after previously playing every year, demonstrates that his condition had a serious impact on his athletic ability and life.

In light of the record evidence, I find that an award of **$42,500.00** for pain and suffering is appropriate.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that G.S. suffered an injury that meets the definition for a Table SIRVA and Petitioner is entitled to compensation. I find that $42,500.00 represents a fair and appropriate amount of compensation for G.S.'s actual pain and suffering**.[7] Additionally, I find that Petitioner is entitled to **$463.04 for out-of-pocket expenses**.[8]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment as follows:**

> A. **A lump sum payment of $42,500.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, for the benefit of G.S. No payments shall be made until**

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[8] The parties agree on this amount. Mot. at *11; Resp. at *3.

**Petitioner provides Respondent with documentation establishing that she has been appointed as the guardian/conservator of G.S.'s estate.**

B. **A lump sum payment of $463.04, representing compensation for past out-of-pocket expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**.

These amounts represent compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.